Filed 9/24/25  In re Avah P. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re AVAH P., a Person Coming Under the Juvenile Court Law. | B339202 (Los Angeles County Super. Ct. No. 24CCJP00737A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. VERONICA P., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Natalie Nardecchia, Judge. Affirmed.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Veronica P. (mother) appeals from the jurisdictional and dispositional orders of the juvenile court regarding her daughter, Avah P. (born July 2017). Mother contends there is insufficient evidence to show Avah P. was harmed or at substantial risk of harm as defined under Welfare and Institutions Code section 300 et seq.[1] We find sufficient evidence supported the court's jurisdictional and dispositional orders and affirm.

## BACKGROUND

**Los Angeles County Department of Children and Family Services referrals and investigation**

On February 24 and 26, 2024, the Los Angeles County Department of Children and Family Services (DCFS) received referrals alleging mother was arguing with Steven G.[2] over him taking their child, K.G., whom mother regularly hit on the back and had caused bruising. Mother pulled a knife and tried to stab Steven G. in front of the child during this argument. It was also reported mother was using methamphetamine and cocaine, while her boyfriend used methamphetamine and heroin. Mother and her boyfriend kept drug paraphernalia, such as needles and a

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] Steven G. is the father of Avah P.'s maternal half-sibling, K.G. K.G. is not the subject of this appeal.

methamphetamine pipe, in the home within the child's access. Also gang members who were seen living in the home had left a gun there.

Maternal grandmother, Amanda C.,[3] told social worker Carlos Hernandez she knew mother used drugs and needed help because Amanda C. too had used them in the past. Amanda C. reported she did not think K.G. was safe. Hernandez responded that neither he nor sheriff deputies observed any safety concerns at the home.

Mother denied all the referral allegations, including her using any drugs. Mother agreed to drug test but failed to do so due to working late and having tested positive for a contagious disease.

On February 29, 2024, Steven G. reported seeing a gun in mother's home during a FaceTime call with her. Steven G. immediately drove to mother's home to get K.G., believing the child was in danger. DCFS received a referral on March 2, 2024, that mother reported a child kidnapping to law enforcement a day prior. Mother reported Steven G. came to her home, punched her two times in the face, and took K.G. Steven G. was arrested and an emergency protective order was issued protecting mother and K.G. from Steven G. That same day, Amanda C. reported to another children's social worker, Veronica Torres, the same concerns she previously reported regarding mother's substance abuse problems and K.G.'s safety. Amanda C. stated Avah P. was with her father, Alexander P. (father), because mother could not care for her. Amanda C. said mother did not drug test because

---

[3]    Amanda C. is also referred to as Amanda P. in the record. We will treat Amanda C. as the correct name because it is used in the custody order and with her contact information.

she would have tested positive and had been asking others how to detoxify to test negative. Mother continued to deny the allegations.

K.G. was taken to the hospital due to concerns regarding mother's and Steven G.'s claims. At the hospital, a sheriff's deputy reported mother displayed behavior consistent with someone using methamphetamine, though the deputy did not think mother was directly under the influence. While waiting for K.G. to be discharged, mother paced back and forth, yelled and cursed at the hospital staff, and demanded to leave with her baby. Hospital security was called, and mother was escorted to the main lobby when K.G. was discharged.

Due to concerns of substance abuse and the recent child abduction, a social worker offered a safety plan. Mother agreed to have K.G. stay with maternal great-grandmother, Mary Ann R., who would monitor contact between the child and mother. Mary Ann R. observed that though mother had behaviors similar to a drug addict, she did not believe mother was using drugs. Mary Ann R. also stated she believed mother needed counseling, but she had no concerns with mother caring for K.G. Mary Ann R. provided father's contact number and confirmed Avah P. was with him.

Also on March 2, 2024, Steven G. told the social worker that when he got K.G. from mother's home, he saw mother's boyfriend in the back taking a needle out of his arm and grabbing a gun. K.G.'s clothes were soiled and she smelled like urine and feces. Steven G. said everyone in mother's family knew of her substance abuse and Mary Ann R. was in denial. Steven G. stated father was aware of mother's substance abuse, which was why Avah P. did not live with her.

On March 3, 2024, maternal great-uncles Joey W. and Scott W., and father, each reported concerns regarding mother's substance abuse. Both Scott W. and father stated Mary Ann R. was both in denial of mother's substance abuse and enabled her. Father said he had physical custody of Avah P. and shared legal custody with mother, who could visit her every first, third, and fifth weekends of the month but failed to comply with the family law order. Joey W. observed mother liked the life of a gangster and was getting worse. She also could not care for her children. Joey W. said mother would put K.G. in a room with a television on while mother partied downstairs with gangsters.

The same day, Avah P. reported when she was at Mary Ann R.'s home over the weekend, along with mother and K.G., mother grabbed Avah P. by the arm and told her to wait in the bathroom so she would not hear a conversation mother was having with Mary Ann R. Avah P. reported Mary Ann R. told mother earlier in the morning to get her life together, and it appeared mother had been drinking. Avah P. stated mother smelled like beer when Avah P. laid in bed with her. Avah P. said she loved mother and liked Steven G., and she felt she needed to take care of K.G. because she worried K.G. would be kidnapped. Avah P. said while she liked visiting Mary Ann R. and mother, she felt safe with father and wanted to remain living with him.

On March 4, 2024, the juvenile court detained Avah P. and K.G. from mother. That day, the social worker and a sheriff's deputy went to mother's home, which had a strong marijuana smell. Mother became irate, yelling and cursing at the two. Social worker Torres tried to de-escalate mother, who held on to K.G. while yelling and cursing. After 20 minutes, mother released K.G. to the social worker.

The same day, the social worker spoke with Mary Ann R. about hiding Avah P. when she visited her home two days earlier. Mary Ann R. admitted Avah P. was in her home, but she felt she had to lie about it when mother stared at her. Before the social worker arrived, mother placed Avah P. in a bedroom and told her not to come out, and Mary Ann R. went along with it.

**Initial proceedings and detainment**

On March 6, 2024, DCFS filed a section 300 petition, alleging mother's substance abuse and the history of violent altercations with Steven G. placed Avah P. at serious risk of harm. At the detention hearing, the court found father was Avah P.'s presumed father. Avah P. was detained from mother and released to father. The court ordered monitored visits for mother, with no one else to be present.

**DCFS's continued investigation**

On March 27, 2024, it was reported mother tried to enroll in drug and alcohol abuse treatment but was ineligible because she denied any drug or alcohol use. Mother indicated her positive drug tests for marijuana were due to secondhand smoke at work. Mother would not admit having a substance abuse problem. The next day, father told the dependency investigator (DI) mother recreationally smoked marijuana and drank alcohol when they were in a relationship four to five years ago. But father said mother did not abuse them or use them while she was pregnant with or around Avah P. Father did not know a lot about mother's and Steven G.'s relationship, but he knew they fought in Avah P.'s presence. Father denied mother used methamphetamine during their relationship and reported he knew of mother's current drug use because Steven G. called in January 2024 and told him mother was around people with drugs and he needed help getting custody of K.G. Father stated mother

6

called him and asked how she could pass a drug test. Father said he was concerned for Avah P. and did not want her around drug use.

Mother left father when Avah P. was almost two years old and was absent from her life from 2020 to 2023. In 2023, mother one day randomly picked up Avah P., did not return her, and then took father to court over custody of the child. Avah P. was eventually returned to father, who was granted physical custody of the child. Father believed mother loved Avah P. and would not harm her, but mother was caught up in "bad stuff," including hanging around gangsters, which could put the child in harm's way. Father wanted sole physical and legal custody of Avah P. so she would not "get dragged into this again" when something happens to mother.

On April 4, 2024, Breanna,[4] mother's former roommate, reported she was living in mother's home when she witnessed mother pull a knife on Steven G. Breanna stated mother became a monster and threatened to stab Steven G. while he was carrying K.G.. Breanna reported Steven G. never pulled a knife or did anything wrong; he was just carrying K.G. to say goodbye. Breanna she never saw Steven G. be physical or violent toward mother. When Breanna told mother to stop, mother directed the knife at Breanna, whom mother had previously threatened to kill for speaking to a social worker regarding this case.

Breanna also reported mother's boyfriend would "beat the crap out of her." The boyfriend once beat mother while she was holding K.G. and she used the child as a shield. Breanna called 911, but mother would not allow them entry. Breanna stated

---

[4]     Breanna D. is erroneously spelled as "Breana" in certain portions of the record.

7

mother was on drugs and was a "different person" and "a monster." Breanna had personally observed mother "smoke dope" (methamphetamine) and "slam" (injected in her veins), saying mother "was drunk all the time," "her whole car smelled like alcohol," and "[s]he would drive with [K.G.] in the car like that." Breanna saw two guns in mother's home, one loaded within the reach of the child. Mother also left drug paraphernalia in the bathroom drawers and syringes in a kitchen cabinet. Mother's home was like a "trap house," with her boyfriend's "hoodlum friends" always hanging out.

On April 8, 2024, the paternal grandmother, Mary H., told the DI that Avah P. and father resided with her, adding she helped father with Avah P. and assisted when mother visited, but mother had not visited since December 2023. Mary H. said mother was not around a lot after she left father and Avah P. and had no relationship with Avah P. during that time. Mary H. thought Avah P. should be in therapy to help her understand mother's behavior.

On April 11, 2024, mother spoke with the DI and denied the allegations of substance abuse and violence against her. Mother stated she stayed away from hard drugs and denied associating with anyone who uses them. Mother did not need to do a drug abuse treatment program because she had no substance abuse problem. Mother had no concerns with father's ability to parent Avah P.

On April 18, 2024, Avah P. told the DI she was used to talking to social workers and said her father "doesn't smoke, he is nice to me, he protects me and I have no worries." Avah P. did not report she observed any fights or arguments when she lived with mother, Steven G., and K.G. Avah P. claimed to be unaware of mother smoking or drinking alcohol.

On April 22, 2024, K.G.'s paternal uncle, Edward G., told the DI mother would drop K.G. off at his home one to three times a week when she ended her relationship with Steven G. Edward G. said he could tell mother was under the influence of drugs and believed marijuana affected mother's parenting ability. There were times when Edward G. was at mother's home, and she would nap or sleep due to the effects of marijuana, while Steven G. would care for the child.

The same day, Amanda C. told the DI that mother drove K.G. while under the influence of methamphetamine, marijuana, and alcohol. Amanda C. confronted mother about it, but mother drove off with the child and almost ran over Amanda C. Mother also hit K.G.'s head on the wall when she grabbed the child during the altercation. Amanda C. thought mother needed drug treatment as she was still toxic, lied a lot, and would lash out. Amanda C. had no concerns about father or Steven G.

From February 28, 2024, to April 8, 2024, mother failed twice to show for drug testing and had two negative drug tests and two positive tests for marijuana. On April 24, 2024, DCFS reported mother no longer lived in her apartment and was instead homeless and resided with friends. Mother distanced herself from her support system because she believed they were out to get her and take her children away. Avah P. lived with father, the paternal grandmother, and the paternal uncle.

Mother visited Avah P. twice following the detention hearing without issues. DCFS recommended terminating jurisdiction for Avah P., with a custody order granting father sole legal and physical custody and monitored visitation for mother.

**Jurisdiction and disposition hearing**

On June 7, 2024, the juvenile court held the jurisdiction and disposition hearing, at which time it found mother not

9

credible regarding her account of what happened between her and Steven G. and her denial of substance abuse. The court found Breanna's statements about the violent incident involving mother pulling a knife on Steven G. and her substance abuse "very credible and powerful." The court observed mother had a long substance abuse history going back to when she was a teenager, noting multiple relatives' statements concerning mother's substance abuse problem and the treatment provider's statement that mother was in denial about it. The court concluded, "there's just an overwhelming amount of evidence."

Mother's counsel represented that mother agreed with Avah P.'s case closing, but requested joint legal custody because there was no allegation of domestic violence between mother and father. Mother also asked her visitation revert back to the prior custody order giving her visits on the first, third, and fifth weekends of each month. Father's counsel disagreed with mother's assessment and requested sole legal and physical custody.

The juvenile court ordered Avah P. removed from mother and released to father, terminated jurisdiction and issued a juvenile custody order granting father sole legal and physical custody. The court ordered mother to attend substance abuse, anger management, individual counseling, parenting, and 12-step programs.

Mother timely appealed.

## DISCUSSION

### I.    Standard of review

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted,

10

supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

## II. Substantial evidence supports the jurisdictional finding that mother's substance abuse placed Avah P. at substantial risk of serious physical harm

Mother contends there is insufficient evidence supporting the juvenile court's jurisdictional finding that Avah P. was at substantial risk of serious physical harm. We disagree.

Substance abuse may serve as a basis for a jurisdictional finding under section 300, subdivision (b)(1)(D), which authorizes the juvenile court to assert jurisdiction over a child when "the child has suffered serious physical harm or there is a substantial risk that the child will suffer serious physical harm 'by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse.'" (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 724.) "In short, there are three elements for jurisdiction under *section 300, subdivision (b)*, namely, (1) neglectful conduct or substance abuse by a parent in one of the specified forms, (2) causation, and (3) serious physical harm to the child, or a substantial risk of such harm." (*Id.* at pp. 724–725, italics added.)

"The finding of dependency cannot be based on substance abuse alone; jurisdiction requires a substantial risk of harm to the child arising from the substance abuse." (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.) "[D]rug use or substance abuse, without more, is an insufficient ground to assert jurisdiction in

11

dependency proceedings under section 300." (*In re L.W.* (2019) 32 Cal.App.5th 840, 849.)

Here, substantial evidence supports a finding there is a substantial risk of harm to Avah P. arising from mother's substance abuse. Mother pulled a knife on Steven G. and threatened to stab him while he was carrying their child, K.G. Breanna witnessed the incident and reported Steven G. was not violent towards mother and was only carrying K.G. to say goodbye. Mother also then directed the knife at Breanna when she told mother to stop. Mother had previously threatened to kill Breanna for speaking to a social worker regarding this case.

The juvenile court found Breanna's statements concerning the incident and mother's substance abuse were "very credible and powerful." Conversely, the court found mother was not credible in her account of what happened during the incident and her denial of substance abuse. "When the exercise of the court's discretion depends on how it resolves questions of fact, we must defer to the court's "'credibility determinations and findings on questions of historical fact if supported by substantial evidence.'"" (*Nissan Motor Acceptance Cases* (2021) 63 Cal.App.5th 793, 817.) "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) The court's assessment of Breanna's and mother's credibility was based on substantial evidence. The court's determination of this matter is therefore entitled to deference.

There is evidence mother's substance abuse led to other harmful or violent incidents, including multiple reports mother

drove with K.G. in the car while under the influence of drugs or alcohol. Amanda C. reported mother drove K.G. while under the influence of methamphetamine, marijuana, and alcohol, and when Amanda C. tried to confront mother, mother drove off with K.G. and almost ran over Amanda C. Mother also hit the child's head on the wall when mother grabbed her during the altercation. Amanda C. reported mother was toxic, often lied, and would lash out.

Breanna reported mother "was drunk all the time," "her whole car smelled like alcohol," and "[s]he would drive with [K.G.] in the car like that." Multiple relatives reported mother having a substance abuse problem. Mother left drug paraphernalia, as well as loaded firearms, in the home and within the child's access. Breanna personally observed mother smoking methamphetamine and injecting it into her veins. Methamphetamine is "'an inherently dangerous drug known to cause visual and auditory hallucinations, sleep deprivation, intense anger, volatile mood swings, agitation, paranoia, impulsivity, and depression.'" (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 449, disapproved of on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989 & *In re N.R.* (2023) 15 Cal.5th 520.)

Mother took no responsibility for her substance abuse and blamed her positive drug tests for marijuana on secondhand smoke at her job. A treatment provider reported mother being in denial about her substance abuse problems. Mother had two failures to appear for drug testing. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) Accordingly, substantial evidence supports the court's finding that mother had an unresolved substance

abuse problem posing a substantial risk of serious physical harm to young Avah P.

In addition, mother maintained her home like a "trap house," with gang members frequenting. Indeed, mother liked the life of gang members as she often partied with her boyfriend and his gang friends while ignoring K.G. Breanna reported mother's boyfriend physically abused mother. Mother's boyfriend once physically assaulted her while she was holding K.G., and she used the child as a shield. Breanna called 911, but mother would not allow them to enter the home. Breanna reported when mother was on drugs she was a "different person" and "a monster."

Mother contends since Avah P. did not reside with mother there is no evidence violence took place in Avah P.'s presence. Mother asserts Avah P. stated she had not seen any fights between mother and Steven G. and was unaware mother smoked or drank alcohol. However, "'the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation]. The court may consider past events in deciding whether a child currently needs the court's protection. [Citation.] A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue."'" (*In re J.A., supra*, 47 Cal.App.5th at p. 1048.) "A parent's past conduct is a good predictor of future behavior." (*In re T.V., supra*, 217 Cal.App.4th at p. 133.)

Here, a family law order granted unmonitored visits for mother and Avah P. three weekends each month. Mother reported Avah P. stayed in K.G.'s room when she visited. On one occasion, Avah P. reported mother smelled like beer when Avah P. lay in bed next to her. Further, Mary Ann R. helped hide

14

Avah P. when the children's social worker investigated. The children's social worker expressed concern Mary Ann R. was not protecting the children from mother's substance abuse problems. Avah P. was thus exposed to mother's unresolved problems permitting the juvenile court to take necessary steps to protect Avah P. without waiting until the child was seriously injured to assume jurisdiction. Given mother's troublesome actions, denial of her problems, and court-ordered unmonitored visits with Avah P., the court had ample basis to find it was proper to assume jurisdiction.

**DISPOSITION**

The jurisdictional and dispositional orders are affirmed.

CHAVEZ, J.

We concur:

LUI, P. J.

GOORVITCH, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.